EDWARD K. PERKINS *v.* ROBIN S. PERKINS

SUPERIOR COURT      JUDICIAL DISTRICT      FILE No. 042555
OF WATERBURY

Memorandum filed November 10, 1977

*Duffy & Tynan,* for the plaintiff.

*Barbara Flanagan,* for the defendant.

*Carl R. Ajello,* attorney general, and *Edward F. Reynolds, Jr.,* assistant attorney general, for the state of Connecticut.

*Francis J. Grady,* for the minor child, Edward K. Perkins, Jr.

WALL, J. In May of 1974 the plaintiff, Edward K. Perkins, asked the defendant, Robin Savard Perkins, to marry him. She had told him that she was pregnant by another man who wanted nothing further to do with her. They went to a physician and confirmed the pregnancy. Perkins assured the defendant that it was all right about the child. He

told her, "We will have it and it will have a father and a name." He promised that he would not deny that the child was his. She accepted his proposal and they were married on June 28, 1974. On September 17, 1974, the child was born. He was named Edward K. Perkins, Jr., and Edward K. Perkins assented to the entry of his name on the birth certificate as the father. Thereafter, Perkins supported Edward, Jr., changed his diapers, and took him around to the in-laws as his own son. The child called Perkins "Daddy." Perkins was for all intents and purposes the father of the child. After approximately two years the marriage broke down and Perkins sued for a dissolution. His complaint described the child as "issue of the marriage." In October, 1976, the court rendered a temporary order awarding custody of the child to the defendant, giving Perkins visitation rights and requiring him to pay child support. On May 24, 1977, Perkins filed an amended complaint describing Edward, Jr., for the first time as "not issue of the marriage." The plaintiff now wishes to be relieved of his obligation to support the child. A finding may enter that the marriage has broken down irretrievably and a decree may enter dissolving the marriage.

The dispute between the parties involves the following question: Should a husband who knew when he married his wife that she was pregnant by another man and who promised to give the child his name and be its father be allowed to deny paternity and avoid supporting the child in a later action for dissolution of the marriage? No Connecticut decision has addressed this issue. Decisions in other states present three alternatives.

The first is to create a conclusive legal presumption of paternity in the husband. *State* v. *Shoemaker*, 62 Iowa 343; *Miller* v. *Anderson*, 43 Ohio St. 473. Those cases refuse to hold the biological father

for support but argue that the husband, by the act of marrying a pregnant woman, voluntarily consented to stand in loco parentis to the child and to adopt it at birth. He alone is liable for its support. In June, 1977, the Ohio Supreme Court reaffirmed this view against strong attack. The court stated: "Rejection of the long-accepted policy proclaimed by *Miller* v. *Anderson* . . . should be undertaken only with a comprehension of the inherent evils to be aroused by such a course. The possible harm is not merely the illegitimation of a heretofore legitimate child, but the disruption of the normal psychological and sociological relationship between father and child which is nurtured by support and association. The creation of an invitation to bring support actions against alleged biological fathers, perhaps many years after the fact, . . . not only present[s] the problem of the staleness of the evidence, but also the possibility of disrupting other established families by moral disparagement and suddenly increased financial responsibilities. Invitation of these evils is not a sagacious action." *Hall* v. *Rosen,* 50 Ohio St. 2d 135, 140.

This alternative has the virtues of simplicity and certainty. It promotes a policy favoring the legitimacy of children. Section 7-50 of the General Statutes does not permit reference to a child's illegitimacy on its birth certificate; § 17-324 allows legitimation through written acknowledgment by the biological father; and § 45-69f, which deals with artificial insemination, declares that "the public policy of this state has been an adherence to the doctrine that every child born to a married woman during wedlock is legitimate," i.e., is the husband's child. Connecticut's presumption of legitimacy, however, is rebuttable "by clear, convincing and satisfactory proof . . . ." *Hartford National Bank & Trust Co.* v. *Prince,* 28 Conn. Sup. 348, 351. Other statutes allow paternity actions to be brought by

married mothers against putative biological fathers. General Statutes §§ 52-435a, 46-63; see *Estey* v. *Mawdsley*, 3 Conn. Cir. Ct. 491.

A second alternative, followed in several states, is to hold a husband obligated for the support of his wife's child only during the marriage. *D.* v. *D.*, 56 N.J. Super. 357; *Wright* v. *Gann*, 27 N.C. App. 45, cert. denied, 288 N.C. 513; *Kucera* v. *Kucera*, 117 N.W.2d 810 (N.D.) (child four years old at divorce); *Burke* v. *Burke*, 216 Or. 691; *Taylor* v. *Taylor*, 58 Wash. 2d 510 (child thirteen years old). Those courts reject the Ohio adoption theory and find the in-loco-parentis relationship to be temporary and terminable at will by the husband. Their reasons appear to be that a "child should be wanted for its own sake, and not . . . accepted incidentally as . . . an attachment of the mother"; *Burke* v. *Burke*, supra, 697; or that "[t]o adopt the . . . [Ohio] rule would make it very difficult, if not impossible, for a woman who is pregnant to induce a man not responsible for her condition to marry her." *Kucera.* v. *Kucera*, supra, 814. By emphasizing exclusively the obligations of biological fathers those courts have created a situation in which a child is secure only so long as his parents remain married. Such an alternative must be rejected as insensitive to the needs and best interests of the child. "To be fatherless is hard enough, but to be fatherless with the stigma of illegitimate birth is a psychic catastrophe." Fodor, "Emotional Trauma Resulting from Illegitimate Birth," 54 Archives of Neurology and Psychiatry 381 in Krause, Illegitimacy: Law and Social Policy, p. 263 n.14.

The third alternative is to use principles of contract and estoppel to bind husbands for child support in particular cases. A case recognizing this approach was *Clevenger* v. *Clevenger*, 189 Cal. App. 2d 658. The court there stated (p. 674): "The rela-

tionship of father and child is too sacred to be thrown off like an old cloak . . . . The law . . . [should not] countenance the breach of an obligation . . . undertaken, partially fulfilled, and suddenly sundered." The child in *Clevenger* was eleven years old and the court believed that an estoppel must run to him and not solely to the wife. It remanded the case for further evidence on the question of whether the child had believed the husband to be his biological father. Cases also recognizing, but not finding sufficient evidence of, estoppel or contract are *Fuller* v. *Fuller,* 247 A.2d 767 (D.C. App.) (marriage three months after the child's birth, child not prejudiced as had always been illegitimate), and *Taylor* v. *Taylor,* 279 So. 2d 364 (Fla. App.) (impotent husband, separation three months after child's birth). In a case with facts nearly identical to those of the present case, except that the child there was five years old at the time of trial, a Missouri court found an express oral contract for continuing child support. The husband had promised that he would recognize and treat the child as his own and that he would not later reject it. *L* v. *L,* 497 S.W.2d 840, 842 (Mo. App.). The court said that the wife's agreement to marry was consideration which made the contract binding. On similar facts the Virginia Supreme Court also found an express contract. Because of promises made to the wife, the court also estopped the husband from pleading the statute of frauds. *T* . . . v. *T* . . . , 216 Va. 867.

This third alternative should be chosen. It promotes the welfare of the child and supports existing state policies. *Morrow* v. *Morrow,* 165 Conn. 665, gives the Connecticut definition of estoppel (p. 669) as follows: " 'There are two essential elements to an estoppel: the party must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and to act

upon that belief; and the other party, influenced thereby, must actually change his position or do something to his injury which he otherwise would not have done. Estoppel rests on the misleading conduct of one party to the prejudice of the other.' " In the present case the defendant was led to believe that her child would have a father who would not later deny that status and its obligations. On the strength of the plaintiff's promises she changed her position by marrying him, giving up the possibility of having the child adopted or of finding other means for its support. The child's name, Edward K. Perkins, Jr., is a continuing statement to him that one particular person is his father. If the plaintiff can now deny paternity the child will be, in his own eyes and in the eyes of others, not simply the child of a broken marriage, but a bastard. The statement in *Morrow* that estoppel did not exist there is not controlling. The facts of that case are inapposite: the child there was born more than a year before the parties' marriage and was "legitimated" through a change of name in Scotland; the mother was contesting the award of custody to her former husband. Furthermore, the court used the law not of Connecticut but of Iowa, the husband's domicil, in determining the validity of the attempted legitimation of the child. *Morrow* thus suggested the possibility of using an estoppel in an appropriate situation. The present case presents such a situation. A second Connecticut case supports a decision to use estoppel here. In *Hartford National Bank & Trust Co.* v. *Prince,* 28 Conn. Sup. 348, which dealt with a contest over a will, the legitimacy of one of the potential heirs was questioned. His parents had been divorced over twenty-five years earlier. One party wished to introduce the deceased father's statements, made during the divorce proceedings, denying paternity of the heir. The court ruled that those denials were admissible only if they had been

made before the subject matter of the controversy arose. It stated (p. 352): "Since support of children born of a marriage is an issue or potential issue in every divorce proceeding and since . . . [the father's] declarations were made subsequent to the institution of a divorce action . . . it cannot be said that . . . [the] declarations were made ante litem motam." The court excluded the denials and found the heir legitimate and able to inherit. The decision is analogous to an estoppel and reinforces the policy of finding children to be legitimate whenever possible.

Use of the theory of estoppel, when the facts of a particular case warrant it, is consistent with prior Connecticut law and fills a gap left by the statutes. That use promotes the state's long-standing policy favoring the legitimacy and best interests of children. The plaintiff husband should be estopped to deny paternity after bringing his action for a dissolution of the marriage. The child, born during the defendant's marriage to a father who promised not to deny his fatherhood, is entitled to remain legitimate and to receive appropriate support from the plaintiff.

It is therefore found that the parties have one minor child, issue of their marriage, to wit: Edward K. Perkins, Jr., born September 17, 1974, and custody of that child is awarded to the defendant with reasonable rights of visitation in the plaintiff.