**Howard CARTER, Defendant-Below, Appellant,**

v.

**STATE of Delaware, BUREAU OF CHILD SUPPORT ENFORCEMENT ex rel. Debra JERVEY, Plaintiff-Below, Appellee.**

Superior Court of Delaware,
New Castle County.

Argued Nov. 18, 1981.
Decided Feb. 3, 1982.

Roderick R. McKelvie, Wilmington, for defendant-below, appellant.

Andrew T. Semmelman, Wilmington, for plaintiff-below, appellee.

BALICK, Judge.

This is an appeal from a decision of Family Court ordering the appellant to pay child support.

The appellant and the child's mother had sexual relations while they were in high school. When the child was born in 1974, the mother informed the appellant that he was the father. Believing this to be the fact, the appellant has visited the child, given it presents, and acknowledged that he is the natural father of the child. On the other hand, he has not cohabited with the mother, supported or agreed to support the child, or attempted to legitimate the child by marrying the mother or by filing a written acknowledgement of parentage in the Prothonotary's office, in accordance with 13 *Del.C.* § 1301. In the course of proceedings for child support brought by the State on assignment from the mother, blood tests were conducted which conclusively show that the appellant is not the natural father of the child. On these undisputed facts, Family Court held as follows:

"I am satisfied from all of the evidence presented that this a classic case for the operation of the doctrine of equitable estoppel. The father has accepted the child as his own, has held the child out to the world as being his and, more importantly, has represented to the child that he is her father. Although there is no direct evidence in this case of detriment to the child, the many cases in various jurisdictions which have dealt with this issue have simply assumed a detriment.

For the above reasons, I hold that Respondent, Howard C. is estopped to deny that he is the father of the child in question and that he is a 'parent' within the meaning of the Delaware support statute."

The Delaware support statute, 13 *Del.C.* § 501(a), says as follows: "The duty to support a child under the age of 18 years, whether born in or out of wedlock, rests primarily upon his parents." In other words, the duty to support rests upon the legal or upon the natural parents. "Parents" means legal parents if the child was born in wedlock, if it was born out of wedlock but was legitimized thereafter, or if it was adopted. "Parents" means natural parents if the child was born out of wedlock and was neither legitimized nor adopted.

The concept of estoppel may come into play in several ways in an action for support of a child. For example, there may be a judicial or a collateral estoppel arising from litigation; there may be a promissory estoppel in connection with a contract with the mother; there may be an equitable estoppel based on acknowledgement of par-

entage to the child; and perhaps there may be an adoption by estoppel. Although Family Court stated that it was applying a "classic" equitable estoppel, it also referred to an implied contract, and the State contends that it applied the doctrine of adoption by estoppel. I will therefore briefly discuss implied contract and adoption by estoppel before turning to equitable estoppel.

Family Court's opinion includes the following passage:

> "Although possibly not included in the classic definition of equitable estoppel, there is one other factor that needs to be mentioned—namely, that when the Petitioner found out that she was pregnant, she wanted to have an abortion but was dissuaded from doing so by the Respondent who urged her to have the child instead. Thus, although he may have been mislead into the belief that he was the father, or simply naive as to biological facts, this was a kind of implied contract by the father that, if the Petitioner did not have the child aborted, he would be a father to the child."

There are issues of fact that must be resolved by Family Court before liability could be based on contract. One of them is mentioned in the passage itself. If the mother knowingly misled the appellant, this might be a defense to a contract claim, assuming that a contract might otherwise be found to exist. Moreover, the appellant denies that he dissuaded the mother from having an abortion. Since the reference to a possible implied contract is *dictum*, it is not ripe for review.

■ Nor do I believe that Family Court intended to apply the doctrine of adoption by estoppel. "Adoption by estoppel" refers to holdings where the court has treated a person as an adopted child even though the statutory requirements for adoption were not followed. If the doctrine were applied in this case, the appellant would be liable as the child's legal parent. The State's contention that the doctrine was applied is based on Family Court's reliance on *Petitioner F. v. Respondent R.*, Del.Supr., 430 A.2d 1075 (1981), which holds that a person claiming to be the natural father of the child has no standing to seek custody from the child's legal parents, and on Family Court's statement that appellant "is a 'parent' within the meaning of the Delaware support statute."

Adoption by estoppel is a doctrine of limited application. This is because adoption has always been statutory and carries legal consequences far beyond imposing the duty of support on the adoptive father. For example, legal relations between the adopted person and his natural parent are terminated. Cf. *Hall v. Rosen*, 50 Ohio St.2d 135, 363 N.E.2d 725 (1977). Adoption by estoppel is usually applied to someone who has expressed the intention to adopt, but has not followed through with the statutory formalities. Annotation: 97 A.L.R.3d 347, esp. § 9 (1980). The doctrine finds its most frequent application where a person is permitted to inherit as an adopted child from his foster parents. Clark on Domestic Relations (West Pub., Hornbook Series 1968) § 18.8. The appellant in this case has never expressed an intention to adopt the child. There would have been no need for him to do so. Believing himself to be the child's natural father, he could have easily legitimated the child in accordance with the Delaware legitimation statute.

■ Family Court based its decision on *Clevenger v. Clevenger*, 189 Cal.App.2d 658, 11 Cal.Rptr. 707 (1961), which is the first case stating that a person who is neither the legal nor the natural parent of a child may nevertheless be held liable for support under the doctrine of equitable estoppel. The discussion of equitable estoppel in *Clevenger* was *dicta*. This court has recently held that the doctrine is inconsistent with the Delaware support statute. *H. M. v. State*, 80A–FE–23, decided September 9, 1981. Even if we assume that an estoppel might otherwise be based on a representation to the child, the doctrine does not apply in this case because essential elements of equitable estoppel are not present.

*Pomeroy* defines equitable estoppel thus:

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract, or of remedy."

3 Pomeroy's Equity Jurisprudence, 5th ed. Symons § 804.

One of the elements of equitable estoppel is that the party estopped must be aware of the facts. Pomeroy states this element thus: "These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him." 3 Pomeroy § 805. In *Clevenger* it appears that the defendant was aware that the child, who was born while the parties were married but during a period of separation, was not his. Although this is not absolutely clear as a matter of fact, the following discussion in the opinion shows that a person who was not aware of the facts would not be estopped:

"If the doctrine of estoppel applies to the deceived putative spouse, it should apply to the deceived putative child. It is true that the court did not apply this doctrine to a paternity case in *Anderson v. Anderson*, 1931, 214 Cal. 414, 5 P.2d 881, but in that situation the putative father himself suffered the deception that the child was his natural issue; he was accordingly not estopped 'from disclaiming fatherhood when the facts became known.' 214 Cal. at page 417, 5 P.2d at page 882."

11 Cal.Rptr. 707, 716

No case has come to my attention where a person who was unaware of the facts has been estopped to deny paternity. The case that comes the closest is *Commonwealth Ex Rel. Gonzales v. Andreas*, 245 Pa.Super. 307, 369 A.2d 416 (1976). In that case the court found that the appellant had sufficient information to raise a question about the paternity of the child. The real ground for the decision seems to be the appellant's lack of diligence and delay in raising the issue. Although he had been advised by the court of his right to raise the issue, he waited almost three years before doing so. See also, *Watts v. Watts*, 115 N.H. 186, 337 A.2d 350 (1975); Uniform Parentage Act, 9A U.L.A. § 6(a)(2).

In the present case, the appellant was young and naive about the biological facts. He apparently had no reason to suspect that the mother was having relations with anyone else. He believed that he was the father of the child until receiving the result of the blood test, when he was shocked to learn otherwise. The trial judge leaves open the possibility that the appellant was knowingly deceived by the child's mother, who was herself apparently naive about the biological facts, but considered it unnecessary to make a finding of fact on this issue because he viewed fraud by the mother to be immaterial on the issue of estoppel based on a representation to the child. Although it is true that the court seeks to protect the child, who is always innocent, it would be unjust to do so at the expense of someone who is also innocent. Estoppel should not be used to impose the substantial financial liability of child support on a person who was himself deceived by the child's mother, whether or not she did so knowingly.

One of the elements of equitable estoppel is that "[t]he truth concerning [the] facts must be unknown to the other party claiming the benefit of the estoppel. . . ." 3 Pomeroy § 805. The mother will of course usually have more information than the male on which to base a judgment about paternity. She will therefore not be able to claim an estoppel against the father based on his acknowledgement of parentage. It is for this reason that *Clevenger* emphasizes that the estoppel is not based on a representation to the mother, but to the child. As stated above, the mother may be able to claim a promissory estoppel in connection with a promise by the male to support the child. See, for example, *Gursky v. Gursky*,

N.Y.Supr., 39 Misc.2d 1083, 242 N.Y.S.2d 406 (1963); *T. . . v. T. . .*, 216 Va. 867, 224 S.E.2d 148 (1976); *Perkins v. Perkins*, 34 Conn.Sup. 187, 383 A.2d 634 (1977).

Other elements of equitable estoppel are that "[t]he conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it" and that "[h]e must in fact act upon [the conduct of the party estopped] in such a manner as to change his position for the worse" or, in short, reliance and detriment. 3 Pomeroy § 805. *Clevenger* discusses these elements in the following passage:

"The husband's representation that he was his natural father would cause these consequences and detriments to the child: (1) It would deprive the child of the potential action of the mother, as his guardian, at the time of the child's birth, to hold the natural father liable for the support of the child. The child thus relies upon the husband's representation and does not attempt to find the natural father. As of the present date it is realistically impossible to do so. This reliance works a definite detriment to the child. (2) It would induce the child to accept the husband as his natural father and render to him the affection and love of a son, with the son's reasonable expectation of care, support and education until adulthood. The reversal of this representation, through the publication of the illegitimacy of the child, inflicts deep injury upon him. To be designated as an illegitimate child in preadolescence is an emotional trauma of lasting consequence. Having placed the cloak of legitimacy upon the child, having induced the child to rely upon its protection, the husband by abruptly removing it surely harms the child. The child has therefore relied on the conduct of the husband to his injury. (3) It would induce the child to hold himself out to the community as the natural son of the husband, one of the benefits which the appellant apparently desired, only to suffer the abrupt removal of that status, and to undergo the subsequent social injury."

11 Cal.Rptr. 707, 714, 715

This passage mentions three kinds of detriment: loss of the natural father as a source of support, emotional trauma, and illegitimacy. It is a fiction to say that the child sustains any of these possible kinds of detriment as a result of reliance on a representation of paternity to the child. The child must depend on his mother or someone else to protect his interest. As stated above, usually the mother will not be misled by a male's representation of paternity to the child, but will have her own reasons for deciding to seek support from a given male. Although it can be expected that a child will be upset when someone who has always claimed to be his father suddenly denies it, it does not follow that the child gave his affection simply because he believed the male to be his natural father and therefore suffered emotional trauma because he relied on the representation of paternity. Nor is illegitimacy the result of reliance by the child.

Family Court said that detriment is assumed. As to loss of support from the natural father and emotional trauma, I agree. It has already been suggested that loss of support from the natural father is not actually caused by the male's representation to the child, but by the mother's decision on where to seek child support. In the present case, it appears that the mother knows who the likely father is, but for her own reasons chose not to seek support from him. I would note that it appears that she chose not to seek support from the appellant either, since there was no such claim until this one was brought by the State. The record does not show that the likely natural father is no longer available. As to emotional trauma, it is not a detriment that the law can remedy. The law cannot prevent fathers from denying paternity. It is doubtful whether it should attempt to do so, since children seem to have a need to know the truth about the identity of their natural parents, even where a strong parental relationship and emotional bond exists with a person who is not the natural parent.

On the other hand, illegitimacy is an actual, not a fictional or assumed, detriment. Although the law cannot prevent emotional trauma when paternity is denied, it can protect the legal status of the child. Judicial protection of legitimacy is firmly established. Although the disadvantages of illegitimacy are disappearing, the policy of protecting "the time-honored presumption of legitimacy" has recently been confirmed in *Petitioner F. v. Respondent R., supra.* That this same concern was paramount in *Clevenger* is shown by the following quotations from that opinion:

"We face here the difficult and unique problem of defining the duty of support which a husband owes to his wife's illegitimate child when the husband, from the date of the birth of the child, accepts the child into his family, publicly acknowledges the child as his own and treats the child as if he were legitimate. We shall point out that while under some circumstances the husband would be estopped to assert the illegitimacy of the child and thereby avoid liability for its support, we cannot ascertain in this record a sufficient basis for such an estoppel."

\* \* \* \* \* \*

"Since every presumption supports the judgment and since basic moral and social considerations impel the full protection of the child, we should affirm the order if it can be rested upon any valid legal basis. There is an innate immorality in the conduct of an adult who for over a decade accepts and proclaims a child as his own, but then, in order to be relieved of the child's support, announces, and relies upon his bastardy. This is a cruel weapon, which works a lasting injury to the child and can bring in its aftermath social harm. The weapon should garner no profit to the wielder; the putative father should earn no premium by the assertion of the illegitimacy of the child. If any legal hypothesis can prevent such an inducement to publication of illegitimacy, we should adopt that theory."

11 Cal.Rptr. 707, 708, 710

So far as one can tell from reading the opinions, in every case where an estoppel has been applied based on acknowledgement of parentage to the child, the party estopped had married the child's mother, and the child would therefore presumably be legitimate if the party estopped were the natural father, but would become illegitimate if he were allowed to deny parentage. In addition to marrying the mother, in several of the cases the male also acknowledged parentage in accordance with the applicable legitimation statute. Although every state has such a statute, there are significant differences among them. Clark on Domestic Relations (West Pub., Hornbook Series 1968) § 5.2. The California legitimation statute that was in effect when *Clevenger* was decided provided as follows: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such." West's Ann.Civ. Code (Cal.) § 230. Although the court said that the statute would not apply because the defendant was not the natural father of the child, one may view the opinion as simply saying that one who legitimizes a child by publicly acknowledging him in accordance with the legitimation statute will be estopped from later asserting the child's illegitimacy.

The Delaware statute provides for legitimation upon marriage of the parents or ". . . upon acknowledgement of the paternity made in writing by the parents . . . and filed in the Prothonotary's office of any county of the State." 13 *Del.C.* § 1301. Cf. Uniform Parentage Act, 9A U.L.A. § 4. The doctrine of estoppel was originally applied to similar formal documents and was applied to conduct in very limited circumstances (estoppel *in pais* ). Equitable estoppel is an expansion of legal estoppel *in pais.* 3 Pomeroy § 802. In the one other Family Court case in which the doctrine of equitable estoppel was applied, *Petitioner G. v. Respondent G.,* Family Court 4–1583, decided August 26, 1974, the respondent had filed a written acknowledgement of paren-

tage under the legitimation statute. Although the court based the estoppel on his conduct, it could have also based it on his formal statutory acknowledgement.

Rather than viewing imposition of the duty of support on a person who is neither the child's legal nor natural father based on his acknowledgement of parentage as an application of the classic doctrine of equitable estoppel, with the element of reliance assumed, it may be viewed as a special application of an estoppel to prevent a person who has knowingly legitimized a child and undertaken the duties of parenthood from later seeking to avoid those duties by denying parentage and illegitimizing the child. However it is viewed, an estoppel may not be applied in the present case because the appellant has not legitimized the child and the child would therefore be illegitimate even if the appellant were the natural father. In other words, the appellant's denial of paternity would not cause the child to lose his legal status as a legitimate child. See *Fuller v. Fuller*, D.C.App., 247 A.2d 767 (1968), rev. den. 418 F.2d 1189 (D.C.App.1969); *Mace v. Webb*, Utah Supr., 614 P.2d 647 (1980). Since the appellant in this case is neither the legal nor the natural father of the child, and is not estopped from asserting the child's illegitimacy, he is not liable for child support, and the order of Family Court must therefore be reversed.